Richard G. Menaker
Samuel F. Abernethy
Karen Kim
MENAKER & HERRMANN LLP
10 East 40th Street
New York, New York 10016
Telephone: (212) 545-1900
Facsimile: (212) 545-1656

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>    LEHMAN BROTHERS INC.,<br><br>                              Debtor. | Case No. 08-01420 (JMP) SIPA |
| JAMES W. GIDDENS, as Trustee<br>for the SIPA Liquidation of<br>LEHMAN BROTHERS INC.,<br>                              Plaintiff,<br><br>              -against-<br><br>THE ROYAL BANK OF SCOTLAND N.V.,<br>                              Defendant. | Adv. Proc. No. 11-     (JMP)<br><br>**ADVERSARY COMPLAINT** |

       Plaintiff, James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI") pursuant to the Securities Investor Protection Act ("SIPA") of 1970, as amended ("SIPA"), 15 U.S.C.A. §§ 78aaa *et seq.*, by and through his undersigned counsel Menaker & Herrmann LLP, for his adversary

complaint against The Royal Bank of Scotland N.V. ("RBS"), formerly known as ABN AMRO Bank N.V. ("ABN"), alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from RBS' refusal to return to LBI more than $345 million (the "Withheld Property") that RBS admittedly owes to LBI, pursuant to the terms of an International Swap Dealers Association, Inc. Master Agreement ("ISDA Master Agreement") covering foreign currency transactions, in order to gain leverage and an improper advantage over LBI, its estate, and other creditors. As alleged justification RBS has asserted, and continues to assert, unlawful and non-mutual setoff rights against LBI based on alleged claims of entities *other than* RBS against LBI and by RBS against Lehman entities *other than* LBI.

2. Specifically, RBS asserts setoff rights on account of obligations (i) that LBI affiliate Lehman Brothers International (Europe) ("LBIE") allegedly owes to ABN, (ii) that LBI allegedly owes to RBS's affiliate, The Royal Bank of Scotland plc ("RBS plc"), and (iii) that LBI affiliate Lehman Brothers Special Financing Inc. ("LBSF") allegedly owes to RBS plc (together, the "Alleged Setoffs").

3. The Alleged Setoffs, as shown by the diagrams below, are non-mutual, meaning the obligations that RBS seeks to set off are not owed by the same parties in the same capacity. Such obligations cannot permissibly be set off against RBS' obligations to LBI because to do so would violate the mutuality requirement of Section 553(a) of Title 11 of the United States Code (the "Bankruptcy Code"). The diagrams

below, with figures calculated by RBS and contained in a May 14, 2009 letter to LBI ("Section 6(d) Letter"), illustrate the various claims and parties thereto.



**RBS' Admitted Liability to LBI**

**Alleged Obligations of LBI and Its Affiliates to Entities Other than RBS**



4. RBS may not avoid paying its own obligation to LBI by netting it against alleged claims that RBS plc may have against LBI or LBSF or a claim ABN may have against LBIE. Such non-mutual setoffs violate Section 553(a) and are detrimental to the LBI estate because, if permitted, they would (a) deprive the Trustee of his rightful claim against RBS for the benefit of LBI's customers and (b) transform RBS plc's and ABN's alleged unsecured claims against LBI, LBSF, and LBIE into allowed secured claims (by virtue of Section 506(a)(1) of the Bankruptcy Code). Because RBS has no valid setoff rights that justify its failure to turn over the Withheld Property to the Trustee, by continuing to withhold such property and by purporting to effect the Alleged Setoffs, RBS has acted, and continues to act, in direct violation of the Bankruptcy Code.

5. To date, RBS has failed to seek relief from the automatic stay to permit the Alleged Setoffs against the $345 million that RBS willfully is withholding from LBI and its estate. The Trustee has demanded turnover of the sum at issue, but in willful disregard of the automatic stay provision of the Bankruptcy Code, RBS steadfastly has refused to make *any* payment, forcing the Trustee to initiate this adversary proceeding to recover LBI's property for the benefit of its estate.

6. RBS purports to justify its willful violation of the automatic stay by reference to the Bankruptcy Code's safe harbor provisions for swap participants and master netting agreement participants (section 560 and 561, respectively (the "Safe Harbor Provisions")). The Safe Harbor Provisions however, as a matter of law, do not permit the exercise of *non-mutual* setoffs in violation of Section 553 of the Bankruptcy Code. Rather, they permit certain *mutual* setoffs to be exercised in connection with the termination, liquidation, and acceleration of swap transactions despite the automatic stay and the Bankruptcy Code's prohibitions of *ipso facto* clauses. RBS's attempt to cloak itself in the Safe Harbor Provisions runs afoul of the clear language, purpose, and intent of those provisions.

7. The Trustee brings this action to protect the interests of its estate and the beneficiaries thereof and to obtain the following relief: (a) a declaration that the Alleged Setoffs are not permitted under Section 553(a) of the Bankruptcy Code; (b) a declaration that no exception to the mutuality requirement in Section 553(a) of the Bankruptcy Code exists by virtue of the Safe Harbor Provisions so as to permit the Alleged Setoffs; (c) an order under Section 542(b) of the Bankruptcy Code requiring

4

RBS, as successor to ABN, immediately to turn over the principal amount of not less than $345,983,625, which it admits is owed to LBI and which is property of the LBI estate under Section 541(a)(1) of the Bankruptcy Code; (d) an order pursuant to Section 542 of the Bankruptcy Code requiring RBS to turn over all Accrued Interest on the Withheld Property, as defined herein; (e) a declaration pursuant to Section 362(a) of the Bankruptcy Code that RBS violated the automatic stay and, consequently, RBS must turn over the Withheld Property plus Accrued Interest, as defined herein; and (f) an award of damages under Section 105(a) of the Bankruptcy Code, based on its willful violation of the automatic stay.

## JURISDICTION AND VENUE

8. On September 19, 2008, (as applicable, the "Commencement Date"), the Honorable Gerard E. Lynch, United States District Court, Southern District of New York, entered the Order Commencing Liquidation of LBI (the "LBI Liquidation Order," Docket No. 1), finding that LBI's customers were in need of protection and commencing liquidation of LBI pursuant to the provisions of SIPA, in the case captioned *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL).

9. The Liquidation Order, *inter alia,* (i) appointed James W. Giddens trustee for the liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); and (ii) removed this case to this Court pursuant to SIPA § 78eee(b)(4), in the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (the "SIPA Proceeding").

10. Following removal to this Court, this Court has "all of the jurisdiction, powers, and duties conferred by [SIPA] upon the court to which the application for the issuance of the protective decree was made." SIPA § 78eee(b)(4).

11. Venue is proper in this Court pursuant to SIPA § 78eee(a)(3), 15 U.S.C. § 78aa, and 28 U.S.C. §1409(a).

12. The Court also has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and (c). This is a core proceeding within the meaning of 28 U.S.C. §157(b). The claims asserted include a prayer for an order to turn over property of the estate. In addition, resolution of the claims asserted herein will have an effect upon the administration of LBI's SIPA liquidation case, the value of its estate, and any distribution to its creditors.

13. Pursuant to 28 U.S.C. §§157(a) and 157(b)(1) and the District Court's reference of proceedings, this Court has subject matter jurisdiction.

14. The Trustee brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seeks relief, *inter alia,* under Sections 105(a), 362, 541, 542 and 553 of the Bankruptcy Code, 28 U.S.C. §2201 and applicable provisions of state law.

### **THE PARTIES**

15. The Liquidation Order authorized the Trustee to take immediate possession of the property of LBI, wherever located and notified all persons and entities that the automatic stay provisions of Bankruptcy Code section 362(a) operate as a stay of, among other things, "any act to obtain possession of property of the estate or property

6

from the estate" (Liq. Order ¶¶ I, II, III.C, XII and XIV). The Liquidation Order also ordered that all entities are stayed and enjoined from directly or indirectly retaining or setting off, or interfering with any assets or property owned by LBI (*Id.* ¶ IV).

16. The Trustee is charged with liquidation of the business of LBI pursuant to the provisions of 78eee(b)(3) of SIPA and the orders of this Court and the District Court. The Trustee is vested by SIPA with the same powers and rights to avoid transfers as a trustee in a case under Title 11, 15 U.S.C.A. § 78fff-1(a), and is also specifically authorized by SIPA to recover property transferred by the debtor that would have been customer property if the transfer were held voidable under the Bankruptcy Code.

17. Upon information and belief, ABN changed its legal name to The Royal Bank of Scotland N.V. ("RBS") on February 6, 2010. The name change was simply a change in its legal name and not a change in the legal entity itself.

18. Upon information and belief, defendant RBS is a public limited liability company organized under the laws of The Netherlands with its principal place of business (registered office) at Gustav Mahlerlaan 10, 1082 PP Amsterdam, the Netherlands. RBS's mailing address in the Netherlands is Post Office Box 12925, 1100 AX Amsterdam.

# FACTUAL ALLEGATIONS

A. **The Prepetition Transactions and RBS' Acknowledgment to Pay LBI the Withheld Funds**

19. On or about March 16, 1998, LBI and ABN entered into a 1992 International Swap Dealers Association, Inc. ("ISDA") Master Agreement (together with all related amendments, annexes and schedules attached thereto, the "ISDA Master Agreement") for the purpose of engaging in certain foreign currency transactions, including swap, spot, and non-deliverable forward transactions. On or about March 31, 2004, LBI and ABN entered into an Amendment Agreement and ISDA Credit Support Annex in connection with the ISDA Master Agreement.

20. The ISDA Master Agreement provides that in the event of a default, such as the bankruptcy of LBI's parent company, the non-defaulting party (the "Determining Party") may designate an "Early Termination Date." Under 6(d) of the ISDA Master Agreement, the Determining Party must then send a statement to the defaulting party, providing calculations for the Close-Out Amount[1].

21. On August 29, 2008, a Close-out Amount Multilateral Agreement was entered into by 91 parties, including ABN and LBI (the "Close-Out Amount Agreement"). The Close-Out Amount Agreement amended the ISDA Master Agreement and similar agreements between the other parties.

---

[1] The Close-Out Amount means the amount of (i) the losses or costs or (ii) the gains of the Determining Party that are or would be (i) incurred or (ii) realized under then prevailing circumstances with respect to each terminated transaction or each group of terminated transactions in replacing or in providing the Determining Party the economic equivalent of (a) the material terms, including the payments and deliveries that would have been required and (b) the option rights of the parties.

22. On September 14, 2008, ABN sent a letter to LBI under Section 6(a) of the ISDA Master Agreement, giving notice of an event of default under that agreement and designating an Early Termination Date of September 15, 2008.

23. On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed for protection under Chapter 7 of the United States Bankruptcy Code.

24. On September 19, 2008, the Honorable Gerard E. Lynch entered the LBI Liquidation Order.

25. On September 22, 2008, ABN sent a second letter to LBI under Section 6(d) of the ISDA Master Agreement, giving notice of an event of default under that agreement and designating an Early Termination Date of September 22, 2008 (the "Early Termination Date").

26. Between March 16, 1998 and the Early Termination Date, ABN and LBI entered into thousands of foreign currency transactions in the form of swap, non-deliverable forward, and spot transactions.

27. As of the Early Termination Date, there were 247 such foreign currency transactions subject to the ISDA Master Agreement, either open or terminated but not settled, between ABN and LBI.

28. As a result of early termination of the foreign currency transactions and in funds owed to LBI for terminated but unsettled foreign currency transactions, ABN owes LBI a "close-out amount" of $293,502,344 (the "Close-Out Amount").

29. Pursuant to the terms of the Credit Support Annex, LBI transferred cash collateral to ABN as security for the foreign exchange transactions LBI and ABN

entered into with each other. As of the Early Termination Date, ABN was holding, and continues to hold, US$53,999,000 in cash as security (the "Cash Collateral"). Combining the Close-Out Amount and the Cash Collateral, ABN currently owes LBI in aggregate the sum of $347,501,344.

30. Upon information and belief, ABN has calculated that the amount LBI owes to it under certain securities lending and underwriting arrangements to be $1,562,719, resulting in a net sum of $345,938,625 being due to LBI.

31. By letter dated May 14, 2009 (the "Section 6(d) Letter"), ABN, writing on The Royal Bank of Scotland letterhead, acknowledged that it owed LBI a the sum of $347,501,344 consisting of both the Close-Out Amount and the Cash Collateral. Specifically ABN wrote: "the amount … payable by us to you (excluding interest at the Applicable Rate) is USD 347,501,344." At no time has ABN or its successor RBS ever contended that the sum owed to LBI was calculated under the terms of any contract other than the ISDA Master Agreement.

32. ABN's Section 6(d) Letter also stated that the "amount would be due on the date of this letter together with interest thereon in U.S. Dollars from and including the Early Termination Date at the Applicable Rate."

33. By letter dated June 24, 2009, the Trustee made a demand for payment of the sum admitted to be due from RBS (referred to hereinafter as the "Withheld Property") but RBS has refused to pay and has not sought permission from this Court to engage in any setoff as described below.

### B. The Alleged Setoffs

34. On February 6, 2010, ABN's name was formally changed to The Royal Bank of Scotland N.V., and it continues to be known by that name as of the date hereof.

35. Despite the fact that the Withheld Property has been due and payable since, at the very latest, the delivery of the Section 6(d) Letter, and despite the fact that ABN explicitly acknowledged that the Close-Out Amount and Cash Collateral due to LBI amount in aggregate to over $345 million in principal, RBS has willfully refused to make any payment to LBI.

36. As purported justification for its intentional violation of the automatic stay, ABN advised in the Section 6(d) Letter that it was "exercising [its] right of set-off arising under certain Terms of Agreement" between LBI and its affiliates and RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. ("RBS Securities")

37. Specifically, ABN contended it could set off the Withheld Property against amounts allegedly owed to RBS plc or amounts owed by LBI affiliates, LBIE and LBSF. ABN then listed in its Section 6(d) Letter the following agreements as the basis for the Purported Setoffs: (i) the 1992 ISDA Master Agreement between RBS plc and LBI dated as of November 25, 1996, as amended and supplemented, where over $40 million is due to RBS plc (the "RBS plc/LBI Master Agreement"); (ii) the 1992 ISDA Master Agreement between ABN and LBIE dated as of January 24, 1997, as amended and supplemented, where over $85 million is due to ABN (the "ABN/LBIE Master Agreement"); and (iii) the 1992 ISDA Master Agreement between RBS plc and LBSF

dated as of September 15, 2003, as amended and supplemented, where over $791 million is due to RBS plc (the "RBS plc/LBSF Master Agreement) and together with the RBS plc/LBI Master Agreement and ABN/LBIE Master Agreement, the "Affiliate Master Agreements").

38. The Terms of Agreement form referred to in ABN's Section 6(d) Letter are alleged to have been "delivered from time to time accompanying 10b-10 confirmations and/or on a quarterly basis to certain of [LBI's] affiliates." The Terms of Agreement form is not claimed to relate to the ISDA Master Agreement between ABN and LBI, or to the Affiliate Master Agreements, upon which ABN purported to base its setoff against the Withheld Property.

39. The Terms of Agreement form instead appears to be an extraneous document allegedly attached to paper confirmations which were sent from RBS Securities (not by ABN) to its customers. Transactions between LBI and ABN were confirmed electronically, which electronic confirmations were reviewed for accuracy by the respective back-offices of the parties. RBS (as ABN is now known) cannot avoid its clear and unequivocal obligations under the terms of the ISDA Master Agreement and the Bankruptcy Code by relying upon an unsigned paper document, apparently used by an RBS affiliate, that did not purport to amend or modify the ISDA Agreement.

40. Since LBI's receipt of the Section 6(d) Letter, the parties have communicated in an attempt to reach a mutual resolution. However, because they disagree over RBS' asserted setoff rights, the parties have reached an impasse, resulting in this adversary proceeding.

# COUNT I

## (Declaratory Judgment under Section 553 of the Bankruptcy Code)

41. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

42. To date, RBS has failed to return any portion of the Withheld Property and has asserted invalid, non-mutual, and unlawful rights of purported setoff.

43. The requirement that all setoffs be of mutual debts is a fundamental tenet in bankruptcy law, codified in Section 553(a) of the Bankruptcy Code, which preserves any right of setoff that a creditor of a debtor may have under applicable non-bankruptcy law, while imposing the additional requirement that any debt sought to be set off against a debt owed to a debtor be a "mutual debt" – i.e., a debt owing by the debtor to the creditor seeking to avail itself of the setoff. Mutuality is strictly construed and requires that the debts and claims be owed between the *same* parties acting in the *same* capacity.

44. The Alleged Setoffs at issue here do not involve "mutual debts" but are attempts by RBS to set off the debts it admittedly owed to LBI against obligations LBI owed to entities *other than RBS*, or that LBI affiliates *other than LBI* owed to RBS. These Alleged Setoffs encompass non-mutual obligations – obligations that are not owed by the same parties in the same capacity.

45. By reason of the foregoing, the Trustee requests judgment declaring the rights and obligations of the parties under the Bankruptcy Code, including a declaration that the Alleged Setoffs are impermissible, unlawful and constitute a violation

13

of the Bankruptcy Code.

## COUNT II

**(Declaratory Judgment under Sections 560 and 561 of the Bankruptcy Code)**

46. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

47. Sections 560 and 561 of the Bankruptcy Code provide that parties to swap agreements and master netting agreements are not barred by the automatic stay from, inter alia, setting off or netting out termination values between them and a counterparty that files for bankruptcy. Neither provision, however, provides for an exception to the express mutuality requirement contained in Section 553(a) of the Bankruptcy Code. Accordingly, RBS may not exercise the Alleged Setoffs under the cloak of the Safe Harbor provisions.

48. By reason of the foregoing, the Trustee requests judgment declaring the rights and obligations of the parties under the Bankruptcy Code, including a declaration that no exception exists under Section 560 or 561 (the Safe Harbor Provisions) allowing the exercise of non-mutual setoff rights in violation of Section 553(a) of the Bankruptcy Code.

## COUNT III

**(Declaratory Judgment and Turnover under Section 362(a))**

49. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

50. Pursuant to Section 362(a)(3) of the Bankruptcy Code, a filing under

the Securities Investor Protection Act of 1970 operates to stay "any action to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.

51. The Withheld Property constitutes property of LBI's estate, and RBS' withholding constituted, and continues to constitute, an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"

52. Section 362(a)(6) of the Bankruptcy Code bars any creditor from undertaking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title" after a filing under the Bankruptcy Code. RBS' assertion of the Alleged Setoffs is an attempt to collect sums allegedly owed to RBS by either LBSF or LBIE in violation of Section 362(a)(6).

53. Section 362(a)(7) expressly prohibits the exercise of a right of "setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor" after a filing under the Bankruptcy Code. Thus, even if RBS had a valid right of setoff under Section 553(a) of the Bankruptcy Code (which it does not), Section 362(a)(7) expressly prohibits it from exercising any such right unless it first promptly seeks relief from the automatic stay, which RBS failed to do.

54. The exception to the automatic stay for swap participants in Section 362(b)(17) to "offset or net out any termination value, payment amount, or other transfer

15

obligation arising under or in connection with 1 or more [swap agreements]" does not extend to protect the exercise of non-mutual setoffs, such as the Alleged Setoffs described herein.

55. The Trustee is entitled to a declaratory judgment that RBS acted in violation of Sections 362(a)(3), 362(a)(6), and 362(a)(7) of the Bankruptcy Code, and an order requiring RBS to pay to the Trustee the Withheld Property and Accrued Interest.

## COUNT IV

### (Alternatively, Turnover of Property Pursuant to Section 542(b) of the Bankruptcy Code)

56. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

57. As a consequence of LBHI's filing for protection under the Bankruptcy Code, ABN terminated the ISDA Master Agreement, effective as of September 22, 2008.

58. Thereafter, on May 14, 2009, ABN, using The Royal Bank of Scotland letterhead, submitted the Section 6(d) Letter, admitting that it owed LBI the sum of $347,501,344 under the terms of the ISDA Master Agreement.

59. Net of sums owed to RBS as stated in paragraph 28 above, the Withheld Property belonging to the LBI estate under Section 541(a) of the Bankruptcy Code and wrongfully retained by RBS amounts to at least $345,938,625.

60. RBS was required pursuant to the ISDA Master Agreement to pay LBI the Withheld Property no later than May 14, 2009, the date on which the 6(d) Letter

was delivered.

61. Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." Accordingly, pursuant to Section 542(b) of the Bankruptcy Code, RBS was required to pay the Withheld Property to LBI, and its failure to do so was in express violation of the Bankruptcy Code.

62. By reason of the foregoing, the Trustee requests in the alternative an order compelling and directing RBS to turn over the Withheld Property, constituting the principal sum of at least $345,938,625, which is property of the LBI estate under Section 541(a) of the Bankruptcy Code.

## COUNT V

**(Demand for Accrued Interest)**

63. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

64. As alleged hereinabove, RBS was required to pay to LBI the Withheld Property on the date the Section 6(d) Letter was delivered, with interest thereon "in U.S. Dollars from and including the Early Termination Date at the Applicable Rate." Section 6(d) Letter, page 2. The ISDA Master Agreement defines "Applicable Rate" as

17

the Termination Rate[2] for obligations from the Early Termination Date until the date of delivery of the Withheld Property, and it is the Default Rate[3] for all obligations after the date of delivery of the 6(d) statement until the date payment is received in full.

65. Interest at the Applicable Rate "will be calculated on the basis of daily compounding and the actual number of days elapsed" under ISDA Master Agreement § 6(d)(ii). Such interest continues to accrue, as provided for in the ISDA Master Agreement, until payment is made in full.

66. RBS failed to deliver the Withheld Property to LBI on the date of the letter, May 14, 2009. Therefore, the Trustee seeks an order requesting payment of interest at the Applicable Rate.

## COUNT VI

**(Request for an Order under Section 105(a) Awarding Damages for Willful Violation of the Automatic Stay)**

67. The allegations in paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

68. Pursuant to Section 105(a) of the Bankruptcy Code, the Bankruptcy Court is authorized to award monetary damages, including actual and consequential damages, and any applicable interest, for a willful violation of the automatic stay.

69. Because RBS willfully violated the automatic stay by withholding

---

[2] The "Termination Rate" is defined in the ISDA Master Agreement as a rate per annum "equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts." Paragraph 14.

[3] "Default Rate," is defined as the "rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amounts plus 1% per annum." *Id.*

property of the LBI estate after a demand for return thereof, in an attempt to exercise non-mutual and impermissible Alleged Setoffs, RBS should be sanctioned and the LBI estate awarded monetary damages, including (but not limited to) actual damages, costs, Accrued Interest, any additional applicable interest, and attorneys' fees and expenses.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that judgment be entered as follows:

A. On Count I, declaring that RBS' assertion of the Alleged Setoffs is unlawful because it is an attempt to set off non-mutual obligations, which is not permitted under, and constitutes a clear violation of, Section 553(a) of the Bankruptcy Code;

B. On Count II, declaring that no exception to the mutuality requirements in Section 553(a) exists in the Safe Harbor Provisions of the Bankruptcy Code to permit the exercise of the, Alleged Setoffs;

C. On Count III, finding that RBS violated the automatic stay by withholding the Withheld Property and attempting to effectuate the Alleged Setoffs and that, as a result, RBS is required to return the Withheld Funds plus Accrued Interest;

D. On Count IV, in the alternative, declaring that the Withheld Property is property of the LBI estate under Section 541 of the Bankruptcy Code and requiring RBS to turn over, under Section 542 of the Bankruptcy Code, the Withheld Property in the amount of not less than $345,938,625;

E. On Count V, requiring RBS to pay Accrued Interest on the Withheld Property under Section 542 of the Bankruptcy Code;

F. On Count VI, sanctioning RBS pursuant to Section 105(a) of the Bankruptcy Code and directing it to pay damages to the LBI estate, including actual damages, costs, attorneys' fees, and expenses incurred by reason of RBS' willful violation of the automatic stay; and

G. For such other and further relief, including interest, costs, and attorneys' fees, as may be just and proper.

Dated: New York, New York
August 19, 2011

          MENAKER & HERRMANN LLP

          By: /s/ Richard G. Menaker
              Richard G. Menaker
              Samuel F. Abernethy
              Karen Kim

          10 East 40th Street
          New York, New York 10016
          Telephone: (212) 545-1900
          Facsimile: (212) 545-1656
          Email: rmenaker@mhjur.com

*Attorneys for James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc.*